IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TWIN CITY FIRE INSURANCE           )
COMPANY, INC.; ALABAMA RIVER       )
PULP COMPANY, INC.,                )
                                   )
        Plaintiffs,                )
                                   )
vs.                                )            CIVIL ACTION 03-0264-P-L
                                   )
AMERISURE INSURANCE COMPANY,       )
                                   )
        Defendant.                 )

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

        This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201 and 2202, by plaintiffs

Twin City Fire Insurance Company, Inc. ("Twin City"), Alabama River Pulp Company, Inc. ("ARP"),

and Hartford Casualty Insurance Company ("Hartford"), against defendants Amerisure Insurance

Company ("Amerisure") and Ohio Casualty Insurance Company ("Ohio") (docs.1, 15, and 30).  Currently

pending before this court are cross-motions for summary judgment filed pursuant to Rule 56 of the

Federal Rules of Civil Procedure: 1) Ohio's Motion For Summary Judgment (docs.60, 78-79), plaintiffs'

Brief In Opposition (doc.80), and Ohio's Reply (doc.85), and Sur-Reply (doc.91); and 2) plaintiffs' Motion

For Summary Judgment (docs.61-62, 65, 68-69), Ohio's Response (doc.81), and plaintiffs' Reply (doc.84).

Also pending before this court is Ohio's Brief Regarding Reasonableness of Settlement Defense and Jury

Demand (doc.86), with plaintiff's Brief In Response (doc.89); and plaintiffs' Motion to Strike Jury

Demand (doc.90).  After careful consideration of all relevant matter, and the record as a whole, this court

finds:  1) Ohio's Motion For Summary Judgment (docs.60, 78-79), is DENIED, in part, and GRANTED,

in part; 2) plaintiffs' Motion For Summary Judgment (docs.61-62, 65, 68-69), is GRANTED, in part, and

DENIED, in part; and plaintiffs' Motion to Strike Jury Demand (doc.90), is MOOT.

## A.  Procedural History

Twin City and ARP filed this declaratory judgment action against defendant Amerisure on May 1, 2003 (doc.1).  On April 13, 2005, plaintiffs filed an Amended Complaint adding Ohio as an additional defendant (doc.15).  On August 9, 2004, plaintiffs filed a Second Amended Complaint adding Hartford as an additional plaintiff (doc.30).  Plaintiffs seek a declaration of the rights and obligations of the parties under their respective insurance policies in connection with two underlying state court tort actions.  _James Paul Dumas, Sr., and Cheryl Dumas v. Alabama River Pulp Company, Inc._, CV-02-3821; and _W. Gerald Stabler v. Alabama River Pulp Company, Inc._, CV-03-3079, Circuit Court of Mobile County, Alabama (collectively referred to herein as the "Dumas/Stabler actions") (docs.1, 15, 30; see doc.68, Ex.H and doc.69, Ex.I).[1]

Plaintiffs allege that this action arose out of a Field Service Agreement (the "Agreement") between ARP and G.A. West and Company ("West"), executed on October 3, 2000 (doc.1), under which West agreed to indemnify ARP for any and all liability arising out of or in any way related to work under the Agreement.[2]  Plaintiffs allege that on October 15, 2002, West employees, Dumas and Stabler were injured on ARP premises within the scope of their employment under the Agreement.  Dumas and Stabler filed the above referred to tort actions against ARP (docs.1, 15, 30).

Plaintiffs allege that ARP is insured by Twin City under a general comprehensive liability policy, and under an excess liability policy.  Plaintiffs allege that ARP is also insured by Hartford under an

---

[1]   This court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332 (doc.1).  Twin City and Hartford are Indiana corporations, Alabama River is an Alabama corporation, Amerisure is a Michigan corporation, and Ohio is an Ohio corporation; it is undisputed that the amount in controversy exceeds the minimum federal jurisdictional requisite (doc.77, ¶¶4-5).  Venue is proper pursuant to 28 U.S.C. § 1391(a)(2), in that the events giving rise to this action occurred in Claiborne, Alabama, located in Monroe County, which is situated in the Southern Division of this federal district.  28 U.S.C. § 81; SD ALA LR 3.1.

[2]   West is not a party to this action.

umbrella liability policy with limits of $10 million in excess of the Twin City policies (docs.1, 30).

Plaintiffs allege that West is insured by Amerisure and Ohio.  Amerisure issued a commercial general liability policy which provides contractual liability coverage for liability assumed in a contract. Plaintiffs allege that the Agreement constitutes an "insured contract" within the meaning of the contractual liability coverage in the Amerisure Policy (doc.1).  Plaintiffs allege that Ohio issued a commercial umbrella policy, under which ARP is an additional insured (doc.15).  Plaintiffs allege that the Ohio policy provides contractual liability coverage to West for liability assumed in an "insured contract," and that the Agreement constitutes an "insured contract" within the meaning of the Ohio policy.  Id. Plaintiffs allege that the insurance coverage referred to above was in full force and effect on October 15, 2002.  Id.

Plaintiffs allege that ARP tendered its defense in the Dumas/Stabler actions to Amerisure and Ohio, and they refused to defend and/or indemnify ARP (docs.1, 15).

Plaintiffs allege that the Dumas/Stabler actions were mediated, with prior notice and an invitation to participate extended to Amerisure and Ohio (doc.30).  Plaintiffs allege that a settlement was reached. Under the settlement, Amerisure agreed to pay its policy limits and one-half of the defense costs incurred in defending the Dumas/Stabler actions, and Twin City and Hartford agreed to fund the remainder of the settlement by the payment of the liability limits of the first two layers of coverage provided by the Twin City policies and the remainder by payment of a portion of the coverage under Hartford's umbrella policy. Id.

Plaintiffs raise five claims:  1) Amerisure is the primary layer of coverage, the Ohio policy is the next layer of coverage, and the Twin City and Hartford policies are in excess to those, and after the exhaustion of Amerisure's coverage and its payment of one-half of the defense costs incurred, Ohio is liable for the remainder of the settlement and defense costs funded by Twin City and Hartford, and is

further liable for costs incurred by ARP; in the alternative, Twin City and Ohio share pro-rata, based on

the limits of coverage and, thereafter, Hartford and Ohio share pro-rata, based on the limits of coverage

under their respective umbrella policies; 2) Twin City and Hartford are equitably subrogated to the rights

of ARP under the Ohio policy by virtue of their payment of funds in settlement and in payment of defense

costs; 3) Twin City and Hartford are entitled to indemnity from Ohio for all sums paid in settlement or

defense; 4) Twin City and Hartford are entitled to equitable contribution from Ohio for its pro-rata share

of the settlement and in defense based upon the respective limits of coverage; and 5) ARP is due costs

incurred in settlement and defense of the Dumas/Stabler actions (doc.30).

On July 16, 2004, Ohio filed its Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules

of Civil Procedure, which included, *inter alia*, a copy of the Ohio Policy (doc.24, p.2, B5).

On August 23, 2004, Ohio filed its Answer to plaintiffs' Second Amended Complaint (doc.34).

Ohio raised numerous affirmative defenses including: "Defendant asserts that the amount and terms of

the settlements of the underlying [Dumas/Stabler actions] are unreasonable and were not made in good

faith"; and "[d]efendant asserts all conditions of the subject insurance policy and any breach thereof"

(doc.34, Seventeenth and Twentieth Affirmative Defenses.).

On September 3, 2004, Ohio filed a jury demand on the issue of the unreasonableness of the

settlements reached in the Dumas/Stabler actions (doc.35).

On December 2, 2004, regarding Ohio's Seventeenth Affirmative Defense, and Jury Demand

pertaining to  the "issue of unreasonableness" (docs.34-35), this court noted that

> the parties are on notice that this court will not review or revisit issues decided by a state
> court...
>
> In the well established spirit of judicial comity, this court will not review, revisit or
> interfere with decisions rendered in the State's Circuit Courts.  Further, the parties are
> reminded that "...judicial proceedings in any court of any... State... shall have the same
> full faith and credit in every court within the United States..."...  This court is not an
> appellate court for decisions rendered in Alabama's Circuit Courts.

(doc.54, p.2-3) (citations omitted).

On December 20, 2004, Ohio and plaintiffs filed the subject cross Motions For Summary Judgment (docs.60 and 61).

On January 10, 2005, the parties filed a Stipulation of Dismissal with prejudice as to Amerisure (doc.73).  On January 14, 2005, a Judgment of Dismissal pursuant to Fed.R.Civ.P. 54(b) was entered (doc.76).

On January 17, 2005, the remaining parties to this action filed their Joint Pretrial Document (doc.77).  Therein, Ohio raised, *inter alia*, the terms and conditions of the Ohio Policy, generally.  Id., p.6-11, and 16.

On January 24, 2005, with counsel for the parties present at what was scheduled to be the Pretrial Conference, this court again took up Ohio's jury demand referring counsel to its December 2, 2004 Order (doc.83, referring to doc.54).  Even so, the parties were afforded the opportunity to brief the issue (doc.83).  Following a discussion of the pending summary judgment Motions, and the possibility of a settlement, the pretrial conference was continued and a settlement conference before the Magistrate Judge was pursued.  Id.

On March 21, 2005, following a brief telephone conference with counsel for the parties, this court deemed that the pending Motions be held in abeyance until the possibility of settlement could be explored before the Magistrate Judge.

On April 26, 2005, a settlement conference was commenced (see doc.92).  No settlement was reached, however, the parties requested, and were afforded additional time to further explore settlement on their own.  Several oral requests for extensions were subsequently granted.  To date, no written motion for a further extension has been forthcoming, nor has this court been notified that a settlement has been reached.  As such, this court deems the subject Motions ripe for consideration.

5

<u>B.  Findings of Facts</u>

On October 3, 2000, West, an Alabama corporation located in Saraland, Alabama, and ARP, an Alabama corporation located in Claiborne, Alabama, entered into the Agreement which was in full force and effect on October 15, 2002 (doc.77, ¶12; doc.68, Ex.K-the Agreement, attached to the Affidavit of Greg Martin, Manager for ARP, dated December 15, 2004, attesting that the copy of the Agreement in evidence is a true and correct copy).  Under the Agreement, West supplied labor to ARP for various maintenance and construction needs, including the labor of Dumas and Stabler (doc.77, ¶13).  Under the Agreement, the "Scope of Work" is defined as "the performance and supply of all the work... on the premises leased by The Industrial Development Board of Monroe County... to [ARP] at Claiborne, Alabama, which the Board has engaged [West] to construct the project on which the work hereunder is to be performed..." (doc.68, Ex.K-Agreement, Art.A.1).  Expressly made a part of the Agreement is the "General Conditions of the Contract" (doc.68, Ex.K).  Therein, the work "Site" is defined as "the place or places where the Work is to be carried out, and the immediate vicinity of such place or places."  <u>Id</u>., Art.1.5.  "Work" means "the completed construction required by the Contract documents, including the performance of all services and operations and the furnishing of all supervision and labor needed to complete such construction."  <u>Id</u>., Art.1.6.

The Agreement provides, in part:

15.1     The Contractor [West] shall be responsible for the health and safety of its personnel and those of its Subcontractors, and at its own expense shall ensure that its work methods, equipment and temporary structures comply with all requirements of all Federal, State, County and local laws and regulations, testing and licensing. [West] shall be responsible for initiating, maintaining and supervising all necessary and desirable safety precautions and programs in connection with the Work, and shall make all changes and additions to its safety programs that may be requested by any interested party.

15.2     Without limiting the generality of Section 15.1, [West] shall comply with all laws with respect to the inspection of equipment and the licensing of its employees and all occupational safety and health standards promulgated pursuant to the Federal Occupational Safety and Health Act of 1970.  It shall require all of its agents,

Subcontractors and all of its and their respective agents, representatives and employees to observe and comply with said laws and standards. [West] shall defend, indemnify and save harmless ARP... and the Board and their respective officers, directors, agents and employees from and against all loss, damage or liability resulting from claims, demands, suits and actions of every kind and nature arising from or related to the violation of any such law or standard by [West] or its Subcontractors or the officers, agents, representative or employees of [West] or its Subcontractors.

(doc.77, ¶14; doc.68, Ex.K).

The Agreement also provides:

18.1   [West] shall maintain the following insurance coverage in effect at all times during performance of the work:

\* \* \*

b.  Comprehensive General Liability Insurance with Contractual and Products/Completed Operations coverage with a minimum combined single limit of $5,000,000 for each occurrence for bodily injury and property damage, subject, however, to a deductible of $25,000 for any loss or occurrence.

18.2   The Contract shall cause ARP,... to be named as additional insured in each policy other than the Workers' Compensation Insurance policy.  Each policy shall waive right of subrogation against ARP,... and their respective officers, directors, employees, and agents, and shall provide that notice must be given to ARP at least thirty (30) days prior to cancellation, non-renewal or material change in coverage.  The Comprehensive General Liability Insurance shall cover performance of the [West's] indemnity obligations provided in Section 18.5.

\* \* \*

18.5   To the fullest extent permitted by law, [West] shall indemnify and hold harmless ARP,... and their respective officers, directors, employees and agents from and against any and all claims, costs, losses and damages (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals and all court costs arising out of or in any way related to the performance of the Work by [West] or the agents, servants, employees or Subcontractors of [West], in whatever manner the same may be caused, and whether or not the same may be caused, occasioned or contributed to by the negligence, sole or concurrent, of ARP,... or their respective officers, directors, agents or employees.

(doc.77, ¶15; doc.68, Ex.K).[3]

---

[3]  In its Response in Opposition to Plaintiffs' Motion for Summary Judgment, Ohio "disputes the facts as stated by plaintiffs in their Brief [doc.62] at Nos. 14, 15..." (doc.81).  However, plaintiffs' paragraph 14 is a direct and accurate quote of Art. 18.5 of the Agreement, and a paraphrase of Art. 18.1 and 2.  The Joint Pretrial Document sets out these Agreement provisions as undisputed facts (doc.77, ¶15).

Twin City issued a policy of primary general comprehensive liability insurance to its named

insured ARP, Policy No. 10ECS0A0484 ("Twin City Primary Policy") with a liability limit of $1 million

(doc.77, ¶6; doc.68, Ex.A[4]).  The Twin City Primary Policy provides:

> We will pay on behalf of [ARP] those sums that [ARP] shall become legally obligated to
> pay as damages because of "bodily injury,"... to which this policy applies; but only to the
> extent that such damages are in excess of the "self-insured retention" that has been
> exhausted solely by the payment of "claim expenses" and that portion of judgments or
> settlements to which this policy would have applied in the absence of the "self-insured
> retention."

(doc.68, Ex.A, p.1 of 19).  "Self-insured retention" is

> the amount [ARP] or any insured must pay as damages and "claim expenses"... for any
> one "occurrence," ... before we will pay anything... [ARP's] obligation to pay the "self-
> insured retention" shall apply fully and separately to each "policy period" and shall not be
> reduced by...  Any payment made on [ARP's] behalf by another, including any payment
> from any other applicable insurance...

Id., p.17 of 19, item 26(c) and (b).  Under the Policy, ARP has a self-insured retention of $50,000.00.  Id.

Twin City also issued a policy of excess liability insurance to ARP, Policy No. 10XSSL6789

("Twin City Excess Policy"), with a liability limit of $2 million (doc.77, ¶7).  The Twin City Excess Policy

provides:

> We will pay on behalf of [ARP] those sums that the insured shall become legally
> obligated to pay as damages which are:...  Because of any injury... for which insurance is
> afforded...  But only to the extent that such damages are in excess of the total limits of
> "underlying insurance" that have been reduced or exhausted solely by payment of that
> portion of judgments or settlements to which this policy applies...

(doc.68, Ex.B, p.1 of 11).  Under the Twin City Excess Policy, "underlying insurance" means "the

insurance policies listed in the Extension Schedule of Underlying Insurance Policies, including any

renewals or replacements thereof, which provide the underlying coverages and limits stated in such

Extension Schedule..."  Id., p.10 of 11.  The Extension Schedule of Underlying Insurance Policies

---

[4]   Counsel for the parties agreed, due to the voluminous nature of the subject Policies, to submit as exhibits
one copy of each (see doc.68-plaintiffs' Notice of Filing in support of plaintiffs' Motion For Summary Judgment).

reflects, in part, $1 million for each accident. Id., p.1. Under the Twin City Excess Policy, $2 million is the most to be paid "regardless of the number of ... insureds... 'Claims' made or 'suits' brought... persons or organizations making 'claims' or bringing 'suits'... Id., p.1, 5 of 11 (SECTION III-LIMITS OF LIABILITY).

Hartford issued an umbrella liability policy to its named insured ARP, No. 10HUSL6792 ("Hartford Policy"), with a liability limit of $10 million in excess of the Twin City Policies (doc.77, ¶8; doc.68, Ex.C, p.1). Under the Hartford Policy, ARP has a self insured retention of $10,000.00. The Policy defines "self-insured retention" as "the amount for which [ARP] must promptly reimburse us as respects damages we have paid on any insured's behalf," and it "shall not be reduced by... [a]ny payment made on [ARP's] behalf by another, including any payment from any other applicable insurance" (doc.68, Ex.C, p.19 of 21, 26(b)).

The Hartford Policy states:

We will pay on behalf of [ARP] those sums that [ARP] shall become legally obligated to pay as damages because of "bodily injury,"... to which this policy applies:

(1) But only to the extent that such damages are in excess of the total limits of "underlying insurance" that have been reduced or exhausted solely by payment of that portion of judgments or settlements to which this policy applies; or

(2) To which no "underlying insurance" applies. But [ARP] agree[s] to reimburse us for any such amount to the extent included under the "self-insured retention."

Id., p.1 of 21. The definition of "underlying insurance" is the same as that reflected in the Twin City Excess Policy, Id., Ex.B, p.10 of 11.

With regard to who is insured, the Hartford Policy states you are covered: "If you are designated in the Declarations as: ... Any subsidiary and subsidiary thereof, of yours which is a legally incorporated entity..." Id., p.9 of 21. An Endorsement effective February 18, 2002, expressly included ARP as a named insured. Id., p.22.

Amerisure issued a policy of primary commercial general liability coverage to its named insured West, Policy No. CPP1313284000002 (the "Amerisure Primary Policy") with a liability limit of $1 million (doc.77, ¶9; doc.78, p.14; doc.68, Ex.D, D214-272).  The Amerisure Primary Policy was issued on January 17, 2002, and was in effect from January 1, 2002 to January 1, 2003 (doc.68, Ex.D, D153).  The Policy, states that

> a.  [w]e will pay those sums that [West] becomes legally obligated to pay as damages because of "bodily injury"... to which this insurance applies...
>
> * * *
>
> c.  Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

(doc.68, Ex.D, D246).  Further, the "Limits of Insurance shown in the Declarations... fix the most we will pay regardless of the number of:... Insureds;... Claims made or 'suits' brought; or... Persons or organizations making claims or bringing 'suits'."  Id., D253.  The Declarations reflects the Limits of Insurance for personal injury is $1 million.  Id., D214.

With regard to who is an insured, the Amerisure Primary Policy provides:

> SECTION II - WHO IS AN INSURED is amended to include as an insured any person or organization, called an additional insured in this endorsement:
>
> 1.  Whom [West is] required to add as an additional insured on this policy under a written contract or agreement relating to your business;...
>
> * * *
>
> 3.  The written contract, agreement or certificate of insurance must be:
>      (a) currently in effect or become effective during the term of this policy; and
>      (b) executed prior to the "bodily injury",... giving rise to a claim under this policy;...
>
> * * *

The insurance provided to the additional insured is limited as follows:

    1. That person or organization is only an additional insured with respect to liability arising out of:

        (a) Premises you own, rent, lease, or occupy, or
        (b) "Your work" for that additional insured...

Id., D237.

    Under the Amerisure Primary Policy, an "Insured Contract" means "[t]hat part of any other ... agreement pertaining to [West's] business... under which [West] assume[s] the tort liability of another party to pay for "bodily injury"... to a third person or organization."  Id., D256, 9f.  "'Your work' means:... Work or operations performed by [West] or on [West's] behalf;..."  Id., D258, 21.

    Defendant Ohio issued a commercial umbrella policy to its named insured West, Policy No. BAXO(04)52 54 05 02 (the "Ohio Policy") with a liability limit of $9 million in excess of the Amerisure Primary Policy (doc.77, ¶10; doc.68, Ex.E).  The Ohio Policy was issued on March 18, 2002, and was in force from January 1, 2002, to January 1, 2003 (doc.68, Ex.E, p.1).  Under the Ohio Policy, "Insured" is defined, in part, as "[a]ny person or organization, other than the Named insured, included as an additional "Insured" by virtue of an "insured contract," and to which coverage is provided by the "underlying insurance," and for no broader coverage than is provided by the "underlying insurance" to such additional insured." (doc.68, Exhibit E, p.7).  Under the Ohio Policy, "'Insured Contract' means any oral or written... agreement entered into by [West] and pertaining to [West's] business under which [West] assume[s] the 'tort liability' of another party to pay for 'bodily injury'... to a third person or organization, provided that the 'bodily injury'... occurs subsequent to the execution of the... agreement..."  Id., p.7-8.

    The Ohio Policy also states:

I. COVERAGE

We will pay on behalf of the "Insured " those sums in excess of the "Retained Limit that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract because of "bodily injury"... that takes place during the Policy Period and is caused by an "occurrence" happening

anywhere.  The amount we will pay for damages is limited as described below in...
Section II.  Limits of Insurance.

II.  LIMITS OF INSURANCE

A.  The Limits of Insurance shown in [IV.  EXCLUSIONS] state the most we will pay
regardless of the number of:

    1.  "Insureds";

    2.  "claims" made or "suits" brought; or

    3.  persons or organizations making "claims" or bringing "suits."

B.  The General Aggregate Limit is the most we will pay for all damages covered under
the [Policy]..., except:

* * *

2.  Coverages included in the policies listed in the Schedule of Underlying Insurance to
which no underlying aggregate limit applies.
The amount stated on the Declarations as the General Aggregate Limit is the most we
will pay for all damages arising out of any "bodily injury"... subject to an aggregate limit in
the "underlying insurance."  The General Aggregate Limit applies separately and in the
same manner as the aggregate limits in the "underlying insurance."

Id., p.1).  "Underlying insurance" is defined as "the insurance coverage provided under policies shown in

the Schedule of Underlying Insurance..."  Id., p.10.  The Schedule of Underlying Insurance reflects, in

part, "Amerisure... 01/01/02 to 01/01/03 General Liability (x) occurrence form $1,000,000 each

occurrence limit[,] $1,000,000 personal... injury limit[, and] $2,000,000 general aggregate limit."  Id., p.3 of

Declarations.

The Ohio Policy also provides:

There will be no right of action against us under this insurance unless:

    1.  you have complied with all the terms of this policy; and

    2.  the amount you owe has been determined by settlement with our consent or
    by actual trial and final judgment;

12

> This insurance does not give anyone the right to add us as a party in an action
> against you to determine your liability

Id., p.12 of 15, H).  The Ohio Policy Declarations reflect "LIMITS OF INSURANCE: $9[million] EACH

OCCURRENCE... [with] SELF-INSURED RETENTION:   $0."  Id., p.1.

The Ohio Policy also contains several "ENDORSEMENTS" to "Section IV - EXCLUSIONS," in

particular: "Any liability of an 'Insured' covered under this policy to any other 'Insured' covered under

this policy."  Id., Endorsement CU 60 26 06 97.

Each of the foregoing Policies were in full force and effect on October 15, 2002 (doc.77, ¶11).

On October 15, 2002, Dumas and Stabler, employees of West, suffered burn injuries on ARP's

premises when a condensate storage tank ruptured under pressure, releasing hot steam and water.  It is

undisputed that at the time of their injuries, Dumas and Stabler were working in the course and scope of

their employment with West; neither were working on the storage tank.  Id., ¶16-18.

Dumas described the events leading up to the rupture:

> Around 2:30 p.m... the red boiler warning light went off.  I called the safety man, Billy
> Black, and told him about the warning lights... and then vacated the boiler.  I told
> employees from National Boiler to leave the boiler floor.  About 25 minutes later I called
> the safety man back and he told me it was a false alarm.  I went back to work and about
> 45 minutes later as I was looking toward the tank I heard a loud noise and saw fire,
> muddy water and then steam.  As I started to run, I was knocked down and was unable
> to get up so I had to crawl down the steps.  I called Billy Black for help on my radio.

(doc.68, Ex.F-Dumas' Answers to Defendant's Interrogatories and Request For Production, No.1, dated

March 14, 2003).  Dumas identified Stabler as a witness to the rupture.  Id., No.2.

The labor of Dumas and Stabler was supplied to ARP pursuant to the Agreement (doc.77, ¶19).

At the time of their injuries, Dumas and Stabler "were engaged in the performance of the 'Work' as

defined under the [Agreement]" (doc.68-Martin Affidavit).

On November 14, 2002, Dumas filed his tort action against ARP in the Circuit Court of Mobile

County, Alabama, for injuries arising out of the tank rupture.  *CV-02-3821* (doc.77, ¶20; doc.68, Ex.G;

doc.69, Ex.H).  Dumas included claims of negligence and wantonness regarding operation of the tank, failing to properly modify, repair and/or maintain the tank, failing to provide adequate warnings as to the dangers in working in the surrounding area, and failure to conduct safety inspections of the tank (doc.69, Ex.H).

On January 2, 2003, ARP made a demand that West and its insurers defend and indemnify ARP in the Dumas litigation (doc.77, ¶22).

On March 4, 2003, the Department of Labor Occupational Safety and Health Administration ("OSHA") issued a Citation and Notification of Penalty on ARP.  The Citation reflects, in part, that ARP "did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees were exposed to thermal burn hazards from steam and hot water" (doc.60, Ex.D, p.6 of 6).

On August 28, 2003, Stabler filed his tort action against ARP in the Circuit Court of Mobile County, for injuries arising out the tank rupture.  *CV-03-3079* (doc.77, ¶21; doc.68, Ex.I).  Stabler's action included the same negligence and wantonness claims as the Dumas action (doc.69, comparing Ex.I with Ex.H).

On October 17, 2003, ARP made a demand that West and its insurers defend and indemnity ARP against the claims brought in the Stabler litigation (doc.77, ¶22-23).  Also, on October 17, 2003, ARP, through its counsel, requested that Ohio defend and indemnify it.  Id., ¶24.  Further demands for indemnity were made upon Ohio on behalf of ARP on December 2, 2003, and January 8, 2004.  Id., ¶25.

Plaintiffs allege that on June 11, 2004, July 5, 2004, and July 20, 2004, counsel for ARP notified Ohio's counsel of upcoming mediation of the Dumas/Stabler actions scheduled for July 21-22, 2004, with former presiding Mobile County Circuit Judge Braxton L. Kittrell, Jr., as Mediator (doc.68, Ex.K-Affidavit of William W. Watts, III, counsel of record for Twin City; and Affidavit of Victor T. Hudson, counsel of

14

record for ARP).

Ohio disputes the facts pertaining to notice of mediation (doc.81, p.1).  Ohio alleges that "[a]s late

as the day prior to the mediation of the [Dumas/Stabler actions], counsel for Ohio... was under the belief

that it was not invited to attend and participate in the mediation."  Id., p.4, ¶6.  By letter dated July 20,

2004, counsel for Ohio wrote to counsel for plaintiffs:

> This will acknowledge receipt of your telefax letter directed to me dated today which I first saw shortly before noon.  In your letter, you invited me and/or a representative of Ohio... to attend the mediations scheduled July 21st and July 22nd...
>
> Neither I nor a representative of Ohio... will be present at the mediation.  I was advised by counsel for Amerisure as late as last week that it was [ARP's] desire that Amerisure and Ohio... not participate in the mediation.  That was reported to my client, and... both my client and I have made other plans.  It was not until I received a telephone call... at approximately 10:00 a.m. this morning that I became aware that [ARP] had changed its position and desired Amerisure and Ohio to be present at the mediation and that Amerisure was intending to participate in same.  ...[W]e are unable to do so on such late notice.
>
> Please advise me immediately upon conclusion of the mediations as to their resolution, if any, and the accompanying terms and conditions.  Additionally, I need copies of all ARP excess policies (certified) as soon as possible...

(doc.81, Ex.1).

By mail dated July 28, 2004, Ohio forwarded to plaintiffs a certified copy of the Ohio Policy

(doc.91, Ex.B).  An uncertified copy had been placed in plaintiffs' possession "early on."  Id., Ex.A.

At the July 21-22, 2004 mediation, the Dumas/Stabler actions were settled.  Amerisure agreed to

contribute its policy limit and agreed to pay fifty percent (50%) of the defense costs incurred by Twin City

and Hartford.  Amerisure did not agree to reimburse ARP its contribution of $60,000.00 in self-insured

retention under the Twin City Primary and Hartford Policies.  The Twin City Excess and Hartford

Policies contributed the remainder of the funds necessary to defend and settle the Dumas/Stabler actions.

The amounts and terms of the settlements are subject to a confidentiality agreement (doc.60, p.5, n.2),

and have been filed under Seal (doc.72).  Ohio did not participate or fund any portion of the settlements or

otherwise pay for the costs of defense (doc.77, ¶26).

An in camera review of the Sealed documents reflects that Release and Settlement Agreements have been executed in the Dumas/Stabler actions (see doc.72, filed under Seal).

### C.  Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987).  A party is entitled to a judgment as a matter of law unless the nonmovant demonstrates that a genuine dispute exists as to an element of his case on which he has the burden of proof.  Celotex, 477 U.S. at 322; Everett, 833 F.2d at 1510.  All factual matters are to be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1987).

Summary judgment is improper if "the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment.  Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  It is under this standard that this court analyzes the cross-Motions For Summary Judgment.

### D.  Discussion

Because the cross Motions For Summary Judgment are substantially intertwined, factually and legally, this court discusses and addresses the issues raised and the arguments presented, rather than addressing each Motion separately.

In a declaratory judgment action where jurisdiction is based solely on diversity, the question of

whether a justiciable controversy exists within the purview of 28 U.S.C. § 2201, is to be determined by federal law. The court, however, will apply the law of the forum state in resolving the substantive issues. Erie R.R. Co. v. Thompkins, 304 U.S. 64, 78 (1938); MacMillan-Bloedel v. Fireman's Ins. Co. of Newark, 558 F.Supp. 596, 598 (S.D.Ala. 1983) (J. Cox). Herein, there is no dispute that Alabama substantive law applies (doc.60, p.7).

The Declaratory Judgment Act is remedial and procedural in nature. It creates no substantive rights or duties. The exercise of the court's power to grant declaratory judgments is discretionary. MacMillan-Bloedel, 558 F.Supp. at 599.

A question regarding "coverage under an insurance policy is a question of law to be decided by the court..." Fireman's Fund Ins. Co. v. Tropical Shipping & Construction Co., Ltd., 254 F.3d 987, 1003 (11th Cir. 2001). Thus, the issues raised herein are properly before this court for disposition. South Carolina Ins. Co. v. Brooks, 575 So.2d 1089, 1090 (Ala. 1991); see B.D.B. v. State Farm Mutual Automobile Ins. Co., 2001 WL 499157, *1 (Ala. Civ. App. 2001) (The interpretation of an insurance contract presents a question of law and issues of insurance coverage are properly decided on a motion for summary judgment).

Ohio raises numerous contentions: West did not contractually assume ARP's liability in the Dumas/Stabler actions and no coverage exists based upon the Agreement (doc.60, p.12); ARP bears the burden of establishing that coverage exists for claims asserted against it, and ARP has failed to do so (doc.78); ARP is not an additional insured under the Ohio Policy (doc.60, p.7doc.81, p.16); Art.18.5 of the Agreement does not require West to indemnify ARP for wantonness which was claimed in the Dumas/Stabler actions (doc.60, p.15; doc.81, p.7-9; doc.85, p.5); West is not a party to this action and a claim for indemnity cannot be adjudicated in its absence (doc.78, p.9); and even if West has an indemnity obligation, such coverage is precluded by the Ohio Policy's "no-action" provision and/or is excluded by

17

the Ohio Policy's Endorsement CU 60 26 06 97 ("the cross suits exclusion") (doc.81, p.4-5, 11; doc.85,

p.6-7).  Ohio further contends that, should this court find that coverage exists for ARP, the Ohio Policy is

not the primary layer of coverage (doc.81, p.12), and that ARP is not entitled to recover its self-insured

retention, $60,000.00, under the Twin City and the Hartford Policies, or its defense costs from Ohio

(doc.60, p.18-19).

Plaintiffs contend that the Agreement is an "insured contract" (doc.62, p.11); thereunder, West

promised to obtain liability coverage naming ARP as an additional insured (doc.62, p.20); pursuant to

Section 18.2 of the Agreement, West promised ARP that it would insure its indemnity obligations (doc.84,

p.14-15); the Ohio Policy was tendered in satisfaction of that promise, Id; and the Ohio Policy provides

coverage for any liability of its insured (doc.62, p.20).  Plaintiffs proffer two alternatives for coverage

allocation, should this court find coverage under the Ohio Policy.  First, plaintiffs contend that the Twin

City Excess Policy and the Hartford Policy are excess to the Ohio Policy based on a comparison of the

"excess insurance" clauses of the Policies (doc.62, p.22); and second, that the Ohio Policy at least

provides coverage pro rata in the Dumas/Stabler actions' settlements (doc.62, p.25).

With regard to Ohio's jury demand on the issue of the reasonableness of the settlements, plaintiffs

move to strike the jury demand (doc.90).  Ohio seeks to pursue the issue of a jury trial on the question of

reasonableness *only* in the event that its summary judgment Motion is not granted (doc.86, emphasis

added).

This court finds that the two primary issues are whether West contracted to indemnify ARP

under the Agreement and, if so, does the Ohio Policy provide indemnification coverage to ARP for its

liability in the Dumas/Stabler actions.

1.  Whether West contracted to indemnify ARP.

As noted, plaintiffs contend that the Agreement is an "insured contract" under which West

promised to obtain liability coverage naming ARP as an additional insured; and pursuant to Section 18.2 of

the Agreement, West promised to secure insurance coverage for ARP's indemnification.

It is undisputed that ARP and West executed the Agreement and that it was in full force and

effect on October 15, 2002 (doc.77, ¶12; doc.68, Ex.K).  The validity of the Agreement as a contract is

not in dispute.

Further, it is undisputed that under the Agreement, West contracted to supply labor to ARP for

maintenance and construction needs, including the labor of Dumas and Stabler.  The Agreement expressly

includes the "General Conditions of the Contract," under which the work site is "the place or places

where the [w]ork is to be carried out, and the immediate vicinity..." (doc.68, Ex.K, Art.1.5).  Work

includes the performance of "all services and operations and the furnishing of all supervision and labor

needed to complete such construction."  Id., Art.1.6.  The scope of work is "the performance and supply

of all the work... on the premises... on which the work... is to be performed..." (doc.68, Ex.K, Art.A.1).

It is undisputed that under the Agreement, West is responsible for the safety of its employees and

is responsible for initiating, maintaining and supervising all necessary and desirable safety precautions.

The Agreement provides that West shall comply with all OSHA standards and "shall defend, indemnify

and save harmless ARP... from and against all loss, damage or liability resulting from claims, ... ***arising

from or related to the violation of any such standard by West*** or its Subcontractors ..." (doc.77, ¶14).

Under Section 18.1, West is to maintain comprehensive general liability insurance coverage during

performance of the work and is to cause ARP to "be named as additional insured."  Id., ¶15.  The

insurance is to "cover performance of [West's] indemnity obligations provided in Section 18.5."  Id.

Section 18.5 states that West "shall indemnify and hold harmless ARP,... from and against any and all

claims,...arising out of or in any way related to the performance of" West's work "in whatever manner

the same may be caused, and whether or not the same may be caused, occasioned or contributed to by

the negligence, sole or concurrent, of ARP,..."   Id.

  This court finds that the undisputed facts establish that West contracted through the Agreement to name ARP as an additional insured, to obtain liability coverage, and to indemnify ARP from any and all claims, arising out of or related to the performance of West's work whether "caused, occasioned or contributed to by the negligence, sole or concurrent, of ARP" (doc.68, Ex.K, Art. 18.5).

  Ohio contends that West did not contractually assume ARP's liability in the Dumas/Stabler actions, in particular; and no coverage exists based upon the Agreement (doc.60, p.12).  In support, Ohio argues that Section 18.5 requiring indemnity and Section 15.2 which does not, raise an ambiguity which cannot be reconciled.  Thus, the ambiguity should be resolved in favor of the first part, i.e., Section 15.2, under which West cannot be required to indemnify ARP.  Brown Mechanical Contractors, Inc. v. Centennial Insurance Co., 431 So.2d 932, 945 (Ala. 1983).

  The evidence presented, however, clearly reflects no conflict between the Sections and no particular ambiguity.  A careful reading establishes that Sections 15.1 and 2, require West to indemnify ARP from losses or liabilities resulting from or related to OSHA violations **by West**.  No evidence has been presented to show that the injuries suffered by Dumas and Stabler resulted from any violation of OSHA by West.  In fact, OSHA issued a Citation against ARP, not West (doc.60, Ex.D).  Thus, Sections 15.1 and 2 are not relevant herein.  It is Section 18.5 which is applicable.

  Ohio argues that even if Section 18.5 is applicable, West has no duty to indemnify ARP because ARP's liability in the Dumas/Stabler actions did not "arise out of," and was not related to West's work (doc.60, p.14).  Section 18.5 requires West, in part, to indemnify ARP against claims "arising out of or in any way related to the performance of Work by [West]" (doc.68, Exhibit K).  Ohio asserts that the Dumas/Stabler actions did not arise out of and was not in any way related to West's performance of its work relying on Brown.

Plaintiff counters with this court's own precedent, Davis Constructors & Engineers, Inc. v. Hartford Accident & Indemnity Co., 308 F.Supp. 792 (M.D.Ala. (Dec. 31, 1968)); see also Stone Building Co. v. Star Electrical Contractors , 796 So.2d 1076, 1083-84 (Ala. 2000)[5] (citing Davis, in support of Stone's position that the "arising out of" language satisfies the requirement that the parties intended indemnification "for liabilities resulting from the work performed under the Subcontract," and for Stone's own non-feasance, malfeasance, and negligence.), to support its contention that the Dumas/ Stabler liability did "arise out of" West's work (doc.80, p.9-12). Ohio argues that Davis Constructors is factually distinguishable and persuasive authority only.

In Davis, a general contractor, Davis Constructors, contracted to build a cotton mill in Rockford, Alabama. USF&G was Davis' insurer of general liability coverage. Davis subcontracted with Jordan Construction to do the masonry work. 308 F.Supp. at 793. The contract expressly provided that Jordan "covenants to indemnify... the Owner of and from all liability,... ***arising out of the work undertaken..., and arising out of any other operation no matter by whom performed for and on behalf of [Jordan].***" Id., at 794 (emphasis added). Hartford Accident & Indemnity ("HA&I") was Jordan's insurer of comprehensive liability. On the job site, scaffolding which had been erected by Davis for Jordan's use collapsed and injured a Jordan employee. The injured employee filed a state court tort action against Davis. 308 F.Supp. at 793-94.

Davis filed a declaratory judgment action seeking a declaration that HA&I was required to defend Davis in the tort action. HA&I filed a third-party action against USF&G alleging that if HA&I were obligated to Davis, the obligation would be secondary and excess only to the coverage of USF&G, and thus HA&I and USF&G would be obligated pro rata. HA&I contended that the accident resulted

---

[5]  Stone, 796 So.2d 1076, aff'd, on the issue of Star's failure to obtain the indemnification coverage for Stone which Star contracted to do and rev'd, on the issue of Star's duty to indemnify Stone; Star Electric Contractors, Inc. v. Stone Building Company, Inc., 863 So.2d 1071 (Ala. 2003).

from the negligence of Davis, and therefore the indemnity clause could not be construed to require Jordan to indemnify Davis for its own negligence. Id. This court found, in pertinent part, that the bricklayer's work, "while standing on the scaffolding is certainly an '... operation... performed for and on behalf of the sub-contractor.' The claim arises out of such 'operation.'" 308 F.Supp. at 795.

Recently, the Alabama Supreme Court decided FabARC Steel Supply, Inc. v. Composite Construction Systems, Inc., ___ So.2d ___, 2005 WL 1189588, at *9 (Ala. 2005). FabARC, began as a wrongful death action brought by the personal representative of the worker killed when a newly constructed wall collapsed. The personal representative sued the contractor Shimizu America Corp., and FabARC. The worker was employed by Composite Construction, a subcontractor of FabARC.[6] Under the contract between FabARC and Composite, Composite agreed to "indemnify,... FabARC from all liability... for personal injury or death... arising out of any work... performed by, for and on behalf of [FabARC] or arising out of [FabARC's] negligence, even if [FabARC] is only partly negligent..." Id., at *2. Under the contract, it was Composite's responsibility, in part, to install angle clips once construction of the masonry wall was complete, but only after Composite was given notice that the wall was ready for the clips (the angle clips were to be welded onto a horizontal steel beam that traversed above the wall). This was not done and the wall collapsed. Id., at *5-6.

In FabARC, the trial court concluded that the death of the worker "did not arise out of any 'work... performed by' [Composite], inasmuch as [Composite] never performed any work or operation relating to angle clips with respect to the wall that collapsed, because the time for its performance of that task never arose." Id., at *10. On this issue, the Alabama Supreme Court affirmed. Id. In doing so, the

---

[6] In FabARC, Shimizu filed a crossclaim against FabARC, and FabARC filed a third party complaint against Composite. Id., at *1-2. Plaintiff and Shimizu settled the wrongful death action. The settlement was paid by Shimizu's insurer Great American Assurance Company. Thereafter, Great American intervened for indemnification from FabARC and Composite. The trial court entered summary judgment in favor of Great American and against FabARC, and in favor of Composite and against FabARC. FabARC appealed. Id., at *3-4.

Court looked to the express language of the parties' contract, and the facts of the calamity to determine that the trial court could well have concluded such. Id.

Herein, under the Agreement, Section 18.5 provides for indemnity "from and against any and all claims,... arising out of or in any way related to the performance of the [w]ork by [West]" (doc.68, Ex.K). The Agreement defines 'work' as "the performance and supply of all the work... on the premises" where the construction project "is to be performed," and the 'site' is defined as "the place or places where the [w]ork is to be carried out, *and the immediate vicinity* of such place or places" (doc.68, Ex.K, emphasis added). It is undisputed that Dumas and Stabler were working in the course and scope of their employment by West at the time of the tank rupture, and that they were working in the vicinity of the tank (doc.77, ¶16-18; doc.68, Martin Affidavit). Dumas' undisputed testimony reflects that he was working close enough to the tank to be knocked down when it ruptured ("About 25 minutes later... I was looking toward the tank I heard a loud noise and saw fire, muddy water and then steam. As I started to run, I was knocked down and was unable to get up so I had to crawl down the steps...), and that Stabler was close enough to be a witness to the rupture (doc.68, Ex.F).

This court, under its own persuasive precedent, Davis, and under the teaching of FabARC, finds that the express language of the Agreement provides for West to indemnify ARP's liability "arising out of or in any way related to the performance of Work by [West]." Thus, it follows that under the Agreement West is obligated to indemnify ARP for its liability in the underlying Dumas/Stabler actions which arose out of West's work. But for West's work, Dumas and Stabler would not have been in the vicinity of the tank when it ruptured.

With regard to Ohio's contention that West did not contractually assume ARP's liability, i.e., for its own negligence, a party can seek indemnity for its own negligence only if the intention to do so is "*expressed in clear and unequivocal language*." Brown, 431 So.2d at 945-46 (emphasis in original);

accord Royal Ins. Co. v. Whitaker Contracting, 824 So.2d 747, 753 (Ala. 2002) ("if the parties knowingly,

evenhandedly, and for valid consideration, intelligently entered into an agreement[] whereby one party

agreed to indemnify the other for its negligent acts and omissions, and the agreement is expressed in 'clear

and unequivocal language,' then that agreement is enforceable."). The burden of proof "is on the

indemnitee to establish the requirements... before the indemnitee is entitled to indemnification..." Brown.

In Brown, Marley Cooling Tower Co., contracted to build a structure for Republic Steel Co.

Goodner Construction ("Goodner") contracted to build the foundation. Goodner subcontracted with

Brown. 431 So.2d 935. The contract between Goodner and Brown included an indemnity clause which

states:

> ... [s]ubcontractor [Brown] hereby covenants to defend, indemnify, save harmless and
> exonerate... [c]ontractor as to and from all liability, claims, lawsuits and demands for
> personal injury... arising out of work undertaken or to be performed by [Brown],... and
> arising out of any other operation no matter by whom performed for and on behalf of
> [Brown]. [Brown's]"... liability insurance policies shall each contain contractual insurance
> coverage so as to protect the [c]ontractor... under this indemnity agreement.

Id., at 945. Ten days after Marley completed its work, a fire completely destroyed the tower. The

insurers filed suit against Goodner, Brown, Republic, and Marley, claiming they owed no coverage and

upon payment of the loss, they would be subrogated to Marley's rights and that it was the negligence of

Goodner and Brown which caused the fire. Goodner filed a cross-claim against Brown seeking

indemnification for damages arising out of Brown's work. 431 So.2d 935-36. The trial court, in part,

found that the fire was proximately caused by the negligence of Goodner and Brown, and that "as a matter

of law... the contract between Goodner and Brown did not require Brown to provide indemnification for

Goodner's own negligence." 431 So.2d at 936.

The Alabama Supreme Court affirmed, in relevant part, concluding that the language of the

indemnity clause did not "clearly and unequivocally express an intent that Brown indemnify [Goodner] for

[Goodner's own] negligence." 431 So.2d at 946. In interpreting the indemnity clause, the Court

considered three factors:  (1) contractual language, (2) identity of the draftsman of the language, and (3) the indemnitee's retention of control."  431 So.2d at 946.

With regard to the contractual language, the Alabama Supreme Court found that "Brown does not agree in so many words to indemnify Goodner for liability resulting from [Goodner's] negligence.  431 So.2d 945.  Regarding identity of the draftsman of the language, the Court noted that the contract was a preprinted form of Goodner's, and construed the ambiguity noted against Goodner.  Id., at 946.  As to the indemnitee's retention of control, the court referred to "control over the activity or property giving rise to liability."  Id.

Herein, this court need only look to the plain language of the indemnity clause in which West expressly agreed to indemnify ARP "whether or not" the harm ***may be caused... by the negligence... of ARP...***" (doc.68, Ex.K) (emphasis added).  This court finds that under Section 18.5 West expressly and unequivocally agreed to indemnify ARP even for ARP's own negligence.

Therefore, this court finds that the undisputed facts presented establish that West contracted with ARP to indemnify ARP for any liability arising out of the work, and even for ARP's own negligence; that West promised to name ARP as an additional insured and did so by adding ARP as an additional insured under the Amerisure Primary Policy; and that West  indemnified ARP utilizing and exhausting the limits of the Amerisure Primary Policy.  With no genuine issue of material fact in dispute, plaintiffs' Motion For Summary Judgment IS GRANTED, in part, to the extent that this court finds that West did contract to indemnify ARP; and Ohio's Motion For Summary Judgment is DENIED, in part, on the issue of whether West contracted to indemnify ARP.

This court now turns to the determinative issue of whether there is indemnification coverage under the Ohio Policy for the Dumas/Stabler actions.  With this declaratory judgment action, plaintiffs are seeking a declaration that Twin City and Hartford are to be indemnified by Ohio for the balance of the mediated

settlements in the Dumas/Stabler actions, i.e., the settlement amounts less the Amerisure Primary Policy

limit and fifty percent of the defense costs.

2.  Whether the Ohio Policy provides indemnification coverage for ARP's liability in the Dumas/Stabler
actions.

Under Alabama law, the insured bears the burden of establishing that coverage exists under a

liability policy for claims asserted against it.  Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990

F.2d 598, 602 (11th Cir. 1993).

Plaintiffs contend that the Ohio Policy was tendered in satisfaction of West's indemnification

promise; and the Ohio Policy provides coverage for any liability of its insured.

Ohio counters that ARP has failed to establish coverage (doc.78).  Specifically, Ohio contends that

ARP is not an additional insured under the Ohio Policy; Art.18.5 of the Agreement does not require West

to indemnify ARP for wantonness which was claimed in the Dumas/Stabler actions; West is not a party to

this action and a claim for indemnity cannot be adjudicated in its absence; and even if West has an

indemnity obligation, such coverage is precluded by the Ohio Policy's "no-action" provision and/or is

excluded by the Ohio Policy's Endorsement CU 60 26 06 97.

After a careful review of all the arguments and authorities presented by both sides to this action,

this court can only find that plaintiffs have failed to carry their burden of establishing that coverage exists.

The undisputed facts presented reflect that the Ohio Policy contains an express "no-action" provision

which precludes any coverage for ARP's liability in the Dumas/Stabler actions.  Even assuming *arguendo*

that indemnification coverage exists for ARP under the Ohio Policy, the coverage is precluded by the "no-

action" provision and plaintiffs's failure to fulfill the conditions precedent of the provision.

The Ohio Policy provides that "[t]here will be no right of action against us under this insurance

unless: ...[Y]ou [West as the insured or ARP, assuming ARP is an additional insured] have complied with

all the terms of this policy; and... the amount you owe has been ***determined by settlement with our***

26

***consent or by actual trial and final judgment...***" (doc.68, Ex.E,  p.12 of 15).  Ohio contends that such a

provision is enforceable under Eleventh Circuit and Alabama law.

      In <u>USF&G v. St.Paul Fire & Marine Ins. Co.</u>, 1996 WL 33155570 (S.D.Ala. (Aug. 29, 1996))

(C.J. Butler) (unreported op., interpreting Alabama law), the underlying state court action arose when a

brick wall collapsed on a construction worker employed by BE&K Construction Co., at an International

Paper facility.  BE&K contracted with International Paper to perform certain construction work, and to

indemnify International Paper for "all liability and responsibility for personal injuries suffered by its

employees..."  <u>Id</u>.  BE&K was provided insurance coverage by USF&G and excess coverage by St.Paul.

<u>Id</u>., at *2.  The construction worker's family brought a wrongful death action without naming BE&K as a

defendant, and the action was settled.  <u>Id</u>., *1.  USF&G paid the litigation costs and the settlement and

brought the declaratory judgment action against St.Paul in an attempt to shift the financial burden.  <u>Id</u>., at

*3.

      The district court found the agreement between BE&K and International Paper to be an insured

contract and that the indemnity provision contained therein was enforceable under Alabama law.  <u>Id</u>., at

*4-5.  The district court concluded that St.Paul and not USF&G should bear the costs of the litigation and

the settlement.  <u>Id</u>., at *6.  In doing so the district court found, in relevant part, the "no-action" provision

within the St.Paul excess coverage inapplicable.  <u>Id</u>., at *7.

      The Eleventh Circuit reversed (doc.81, Ex.3, copy attached).  The Eleventh Circuit noted that the

St.Paul "no-action" clause precluded direct actions against St.Paul until proper steps were taken against

the insured.  <u>Id</u>., at *3.  The clause is similar to the provision *<u>sub judice</u>*.  <u>Id</u>.  The Eleventh Circuit noted:

"Under the clear language of this [clause], St. Paul is immune from direct suits to enforce a policy until

judgment is rendered against the insured or a written agreement is made..."  <u>Id</u>., at *7.  The Eleventh

Circuit determined that the district court had erred as neither condition of the "no-action" clause had been

met.  There had been no trial, nor had a written agreement signed by the insured, BE&K been executed.

Id., at *8.  The Court noted:  "[E]ven though the St.Paul policy gives coverage to BE&K's liability under

indemnification agreements, St.Paul does not have to pay USF&G because the amount of BE&K's liability

had not yet been 'finally decided.'"  Id.

The Eleventh Circuit's decision in USF&G is consistent with Eleventh Circuit precedent and with

Alabama law.

> Alabama courts have consistently recognized the general enforceability of no-action
> clauses.  See e.g., First Ala. Bank v. First State Ins. Co., 899 F.2d 1045, 1065-66 (11th Cir.
> 1990) (applying Alabama law), MacMillan-Bloedel v. Fireman's Ins. Co. of Newark, 558
> F.Supp. 596, 598 (S.D.Ala. 1983) ("No action clauses in insurance policies have been
> uniformly upheld by the Alabama courts"), Ohio Cas. Ins. v. Gantt, 54 So.2d 595, 600
> (Ala. 1951), Hughes v. Hartford Accid. & Indem. Co., 134 So.461, 463 (Ala. 1931).

> * * *

> The Alabama direct action statute and the no-action clause are not in conflict.
> Ala. Stat. § 27-23-2 provides that

>> [u]pon the recovery of a final judgment against any person, firm or
>> corporation by any person, including administrators or executors, for loss
>> or damage on account of bodily injury, or death or for loss or damage to
>> property, if the defendant in such action was insured against the loss or
>> damage at the time when the right of action arose, the judgment creditor
>> shall be entitled to have the insurance money provided for in the contract
>> of insurance between the insurer and the defendant applied to the
>> satisfaction of the judgment, and if the judgment is not satisfied within 30
>> days after the date when it is entered, the judgment creditor may proceed
>> against the defendant and the insurer to reach and apply the insurance
>> money to the satisfaction of the judgment.

> As the Alabama Supreme Court held many years ago, "[t]his statute confers upon
> the injured person a right to recover against the defendant's liability insurance carrier the
> insurance money provided for in the contract of insurance *upon the recovery of a final
> judgment*."  Ohio Cas. Ins. Co. v. Gantt, 54 So.2d 595, 597 (1951) (emphasis added)
> (internal quotations omitted).  Both the clause and the statute achieve the same thing in
> this case: [T]hey prevent direct action against a liability insurer until a judgment has been
> entered (or, under the terms of the no-action clause, BE&K agrees in writing that it is
> liable, which it has not done).

(doc.81, Ex.3, at *8-9).

In <u>MacMillan-Bloedel</u>, the subject insurance policy contained a "no-action" provision.  The court determined in the exercise of its discretionary authority that it would "decline to entertain this declaratory judgment action until such time as the question of the... liability to MacMillan-Bloedel is finally determined. If MacMillan-Bloedel is successful in the tort action, <u>Ala</u>. <u>Code</u> § 27-23-2... provides a remedy."  558 F.Supp. at 600.  The court concluded that the plaintiff had no standing to maintain the declaratory judgment action at the time.  <u>Id.</u>, (<u>citing</u> <u>Maness v. Alabama Farm Bur. Mut. Cas. Ins. Co.</u>, 416 So.2d 979, 981-82 (Ala. 1982)) ("Once an injured party has recovered a judgment against the insured, the injured party may compel the insurer to pay the judgment.  The injured party, however, can bring an action against the insurer only after he has recovered a judgment against the insured...").

Herein, the Ohio Policy's express "no-action" provision unequivocally precludes coverage ***until "settlement with [Ohio's] consent or by actual trial and final judgment***..."  (doc.68, Ex.E,  p.12 of 15). The undisputed facts presented indicate that neither condition has been met.  The Dumas/Stabler actions did not proceed to trial, they were settled through mediation prior to trial without Ohio's consent.  Thus, under the Eleventh Circuit's persuasive authority, <u>MacMillan-Bloedel</u>, 558 F.Supp. 596, and <u>USF&G</u>, as well as the Alabama Supreme Court's authority, <u>Maness</u>, 416 So.2d 979, this court finds that any liability coverage under the Ohio Policy is precluded by the "no-action" provision.

Plaintiffs do not challenge the existence of the provision or its clear mandate.  Plaintiffs argue that Ohio waived any defense based upon the "no-action" provision insofar as defenses which arise out of express conditions contained in an insurance contract are waivable.  <u>Mutual Service Ins. Co. v. Frit Industries, Inc.</u>, 358 F.3d 1312, 1323 (11th Cir. 2004).  An affirmative defense not asserted in a responsive pleading is generally deemed waived, <u>American Nat'l Bank of Jacksonville v. Federal Deposit Ins. Corp.</u>, 710 F.2d 1528, 1537 (11th Cir. 1983).

In <u>Mutual Service Ins.</u>, the Eleventh Circuit addressed, in part, the issue of attorney's fees as

29

appropriate damages when incurred as a result of a refusal to defend in the insurance coverage context,

under Alabama law.  358 F.3d 1322-23.  The district court ruled that the insurers had waived their

objection to the reasonableness or necessity of the incurred fees.  Id., 1323.  The Eleventh Circuit noted

that

> not all defenses are capable of being waived under this doctrine.  Rather, the only
> defenses capable of waiver are those which arise out of an express condition contained in
> the insurance contract.  First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.,
> Inc., 899 F.2d 1945, 1063 (11ᵗʰ Cir. 1990); Wood v. Mut. of New York Life Ins. Co., 405
> F.Supp. 685, 686 (N.D.Ala. 1975); cf. [Home Indem. Co. v.] Reed, 381 So.2d [45] at 50
> [(Ala. 1980)] (waiver cannot be applied to enlarge coverage of policy)...

Id.  The Eleventh Circuit determined that because the issue (fees incurred as a result of the refusal to

defend) arose from Alabama law rather than out of an express condition of the policy, the insurers had not

waived their right to challenge the reasonableness and necessity of attorney's fees.

   Reed, 381 So.2d 45, a declaratory judgment action, arose out of a vehicle accident and concerned,

in part, the issue of a waiver of a particular policy provision regarding who is an insured.  Id., at 46, 50-51.

However, with regard to waiver, the Alabama Supreme Court noted:

> Although [it] may be extended to practically every ground on which an insurer
> may deny liability based on forfeiture, the doctrine is not available to bring within the
> coverage of a policy risks not covered by its terms or risks expressly excluded therefrom...
> Thus, coverage under an insurance policy cannot be created or enlarged by waiver or
> estoppel and, if there is no ambiguity, it is the duty of the court to enforce the policy as
> written...

Id.

   In American Nat'l Bank of Jacksonville, a distinguishable protracted interpleader action, the district

court determined that the Federal Deposit Insurance Corp. ("FDIC") was entitled to the interplead funds.

Competing claimant Sumner Financial Corp., appealed.  Id., at 1530-33.  On appeal, Sumner Financial

argued, inter alia, that FDIC's claim was barred by the applicable statute of limitations.  Id., at 1536.  The

Eleventh Circuit discounted the argument insofar as Sumner had raised it for the first time on appeal.

"[W]e need not consider these points since [Sumner] waived its right to advance the statute of limitations defense by its failure to assert this affirmative defense in any pleading filed below in compliance with Fed.R.Civ.P. 8(c)." Id., at 1537.  Sumner argued that it had raised the defense before the district court and FDIC's failure to object constituted implied consent to litigate the issue.  Id.  The Eleventh Circuit was unpersuaded noting that Sumner "merely advanced the notion... [in its closing argument to the district court]," Id., n.12, and affirmed the district court.  Id., 1542.

Herein, the facts are distinguishable.  In its Answer to plaintiffs' Second Amended Complaint filed on August 23, 2004, Ohio expressly raised as an affirmative defense, "all conditions of the subject [Ohio Policy] and any breach thereof" (doc.34, Twentieth Affirmative Defense).  On January 17, 2005, the Joint Pretrial Document was filed (doc.77).  Therein, Ohio again raised, *inter alia*, the terms and conditions of the Policy, albeit generally.  Id., p.6-11, and 16.  Further, trial has not been scheduled.

Moreover, American Nat'l Bank of Jacksonville, has been distinguished.  Nixon v. Life Insurance Co. of North America, 130 F.Supp.2d 1279, 1288 (M.D.Ala. (Jan. 23, 2001)) (J. Thompson).  Nixon, is an ERISA action involving the denial of long term disability benefits.  Plaintiff filed suit against his employer HealthSouth and Life Insurance Co., alleging breach of fiduciary duty.  Life Insurance Co., asserted as an affirmative defense, the plan's pre-existing illness provision.  Nixon filed a motion to strike the affirmative defense contending that it was untimely filed.  Id., at 1284, 1287.  The district court found that despite the untimely manner in filing the defense ("until almost three months" beyond the filing of the amended complaint), plaintiff knew of the pre-existing-condition-limitation clause and thus was "not unfairly surprised."  Id., at 1288.  The court noted:

> The general rule is that when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial.  See Hassan [v. United States Postal Serv.,] 842 F.2d [260] at 263 [(11ᵗʰ Cir. 1988)] (citing American Nat'l Bank of Jacksonville v. Federal Deposit Ins. Corp., 710 F.2d 1528, 1537 (11ᵗʰ Cir. 1983)).  "However, the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses. [Courts must avoid hypertechnicality in

pleading requirements and focus, instead, on enforcing the actual purpose of the rule." Id.

   The purpose of Rule 8(c) is to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to litigate properly. See Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989); Hassan, 842 F.2d at 263.  "When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." Id., at 263.  And, thus, "when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." Id.,; see also Grant, 885 F.2d at 797 (stating that where a plaintiff received notice of an affirmative defense by some means other than pleadings the defendant's failure to comply with Rule 8(c) does not prejudice the plaintiff).

130 F.Supp.2d at 1287.  This court finds Nixon, persuasive.

   Herein, as noted above, Ohio expressly raised "all conditions" of the Ohio Policy as its Twentieth Affirmative Defense in its Answer to plaintiffs' Second Amended Complaint (doc.34).  The sole subject matter of this declaratory judgment action is whether indemnification coverage is available to plaintiffs under the Ohio Policy.  Thus, it is reasonable to expect that knowledge of the Policy terms, conditions, and any exclusions thereto are crucial to both sides of this action.

   The undisputed facts show that as early as July 16, 2004, Ohio filed its Initial Disclosures pursuant to Fed.R. Civ.P. 26(a)(1), and this court's Order Re Rule 16(b) Scheduling Order dated July 13, 2004 (doc.22, item 1).  The Disclosure listed a copy of the Ohio Policy (see doc.24, p.2, B5).  Plaintiffs do not allege that they were not provided with a complete copy of the Ohio Policy.  Thus, plaintiffs can hardly argue that they have been "unfairly surprised" by the existence of the "no-action" provision or by the "no-action" defense raised by Ohio.  This court finds that Ohio did not waive its "no-action" defense.  Nixon, 130 F.Supp.2d at 1290.

   It is undisputed that the Ohio Policy contains an express "no-action" provision which is clear in language and unambiguous in its intent.  The provision precludes coverage unless one of two conditions have been met: The amount ARP owes "has been determine [1] by settlement with [Ohio's] consent or [2] by actual trial and final judgment" (doc.68, Ex.E, p.12 of 15).  It is undisputed that neither condition has

been met.  Thus, coverage is precluded.

Plaintiffs also argue that Ohio had prior notice of the mediation proceedings but did not participate. Ohio disputes the facts alleged by plaintiffs regarding notice.  Ohio argues that notice did not come until the day before the scheduled mediation, too late for Ohio to participate.  Although there is a factual dispute regarding the issue of notice to the mediation, the disputed facts are not material to the issue of coverage. The undisputed facts establish that Ohio did not participate in the mediation proceedings and did not consent to the settlement agreements.  Without Ohio's consent to settlement, or a trial and judgment, coverage is precluded.  As noted, plaintiffs have failed to establish that these conditions precedent to the "no-action" provision of the Ohio Policy have been met.  Coverage is precluded.

Insofar as coverage under the Ohio Policy is precluded by the "no-action" provision contained within the Ohio Policy, and there is no genuine issue of material fact in dispute as to the issue, this court finds that Ohio's Motion For Summary Judgment, pertaining to the issue of indemnification coverage under the Ohio Policy, is GRANTED; and that plaintiffs' Motion For Summary Judgment on the issue is denied. In light of this ruling, this court need not address the balance of the outstanding issues: Whether West is an indispensable party to the underlying Dumas/Stabler actions and this declaratory judgment action; whether the "cross suits exclusion" of the Ohio Policy excludes coverage; and whether plaintiffs can recover defense costs from Ohio.  Further, this court need not determine the layers of coverage of the party-insurers.

Plaintiffs' Motion to Strike Jury Demand.

Plaintiffs move to strike the jury demand filed by Ohio on the issue of reasonableness of the settlements in the Dumas/Stabler actions (doc.90).  Ohio contends that it does not concede that it has any obligation to plaintiffs for any portion of the Dumas/Stabler actions settlement, and seeks a jury trial on the reasonableness issue "*only in the event that the court does **not** grant its Motion For Summary*

*Judgment*" (doc.86) (emphasis added).

Insofar as this court has granted Ohio's Motion For Summary Judgment on the issue of indemnification coverage herein, plaintiffs' Motion to Strike Jury Demand is rendered MOOT.

### E.  Conclusion

For the reasons stated herein, it is ORDERED that the Motion For Summary Judgment filed by plaintiffs Twin City Fire Insurance Company, Inc., Alabama River Pulp Company, Inc., and Hartford Casualty Insurance Co. (doc.61), be and is hereby GRANTED, in part, and DENIED, in part.  The Motion is GRANTED as to plaintiffs' contentions that the Agreement is an "insured contract" and thereunder West promised to obtain liability coverage naming ARP as an additional insured; and that pursuant to Section 18.2 of the Agreement, West promised to indemnify ARP's liability obligations.  The Motion is DENIED as to plaintiff's contention that the Ohio Policy provides indemnification coverage for ARP in the Dumas/Stabler actions.

It is further ORDERED that the Motion For Summary Judgment filed by defendant Ohio Casualty Insurance Co. (doc.60), be and is hereby DENIED, in part, and GRANTED, in part.  The Motion is DENIED as to Ohio's contentions that West did not contractually assume ARP's liability in the Dumas/Stabler actions and no coverage exists based upon the Agreement.  The Motion is GRANTED as to Ohio's contention that the "no-action" provision in the Ohio Policy precludes coverage for the Dumas/Stabler actions.

It is further ORDERED that plaintiffs' Motion to Strike Jury Demand (doc.90), be and is hereby rendered MOOT.

Accordingly, insofar as this court finds that indemnification coverage under the Ohio Policy, if any, is precluded by the "no-action" provision, it is ORDERED that this declaratory judgment action be and is hereby DISMISSED with prejudice.

DONE this 19th day of September, 2005.

                     _S/Virgil Pittman_____
                     SENIOR UNITED STATES DISTRICT JUDGE